No. 81-104

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

IN RE THE MARRIAGE OF

MARGARET K. HUNTER,

Petitioner and Respondent,

and

LEONARD R. HUNTER,

Respondent and Appellant.

Appeal from: District Court of the Second Judicial District,
In and for the County of Silver Bow
Honorable Arnold Olsen, Judge presiding.

Counsel of Record:

For Appellant:

Knight, Dahood, McLean and Everett, Anaconda, Montana

For Respondent:

Corette, Smith, Pohlman and Allen, Butte, Montana

Submitted on briefs: October 22, 1981

Decided: January 14, 1982

Filed: JAN 14 1982

Thomas J. Kearney
_____Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Leonard R. Hunter appeals from the property settlement provisions of a divorce decree entered in the Second Judicial District, Silver Bow County.

The following issues are presented to this Court for review:

1) Whether the District Court erred in considering as part of the marital estate the sum of $51,000 which was deposited by the husband in a checking account in his name during the 18 months preceding trial, and expended by him prior to trial.

2) Whether the District Court erred in awarding and distributing the marital property without first determining the net worth of the parties at the time of the divorce.

The husband, in his brief, raises a scattering of other challenges to the equitability of the valuation and distribution of the property, which we will consider in their turn.

We affirm in part and reverse in part.

Margaret and Leonard Hunter were married in 1954. They have three sons, all of whom have reached their majority. In the twenty-six years of their marriage, the parties have amassed a considerable estate, primarily comprising real estate in and around the City of Butte. The property varies widely in perceived value according to its development potential, and other factors considered by the appraising party.

In the early years of their marriage, the husband worked at mining and laying linoleum. Since 1978, he has been limited by his health to land contracting and developing.

His wife agrees that he was "an aggressive worker and a good provider." His wife left her work as a telephone operator upon their marriage and devoted herself to raising their three sons. She was rehired by Mountain Bell in 1968, and worked just over eight years, when a reorganization resulted in her being laid off rather than retrained. She collected unemployment for a time, but has not returned to work because of her health and her limited qualifications.

In September of 1978, the wife petitioned for dissolution of her marriage. The separation was acrimonious, and the parties were unable to reach a mutually acceptable property settlement. On September 26, 1978, the day the petition for dissolution was filed, and again on July 31, 1979, the District Court ordered the husband to refrain from "transferring, encumbering, concealing or otherwise disposing of any property except in the usual course of business or in the necessities of life." The husband's own testimony revealed that he thereafter sold 100 shares of Pabst Blue Ribbon stock and spent the proceeds. The wife produced bank records to show that he deposited over $51,000 into a checking account with the First Metals Bank & Trust Co. of Butte, in the name of Leonard Hunter, and withdrew all but a few dollars, in the time between the petition and the dissolution.

A hearing was held on March 20, 1980, at which time the wife's petition for dissolution was granted. At that time and at a subsequent hearing held June 19, 1980, the District Court heard extensive testimony regarding the amount and value of the property owned by the parties. The findings of fact, conclusions of law and judgment were entered, with regard to the dissolution, on July 10, 1980, and, with regard to the property distribution, on July 17, 1980. The

District Court in its amended decree of distribution, filed October 6, 1980, awarded the husband real property and other marital assets amounting to $203,236.00. The award to the wife amounted to only $178,200.00, but the award to her is free and clear of all liens and encumbrances. In addition, in order "to establish a more equitable distribution," the husband is obligated to pay the wife $9,000, at $900 annually, over a ten year period, and all of his real property is mortgaged to secure this obligation. No maintenance award was made to the wife, despite the trial court's finding that she is not qualified for employment. The husband's motion to amend the judgment with regard to the property distribution was granted only in its smallest particulars and the husband appeals to this Court.

I.

The husband argues that Montana case law mandates reversal because the District Court included in the marital estate the $51,000 the husband had deposited in the Butte bank over an eighteen month period subsequent to the wife's petition for dissolution. What is more, the District Court "awarded" the entire amount to the husband, although at the time of the dissolution, the money was no longer part of the estate, and the husband claimed to have spent it on business matters and for his own maintenance. The husband relies upon In re Marriage of Lippert (1981), ____ Mont. ____, 627 P.2d 1206, 38 St.Rep. 625, wherein this Court overturned the District Court's disposition of marital estate because that court included in the marital estate $96,000 which the husband had allegedly squandered on an unwise business investment. Appellant now argues that we are bound by Lippert, wherein we stated that (1) the worth of the marital

-4-

estate must be determined at or near the time of dissolution, and (2) the District Court may never award more than 100% of the marital estate, and (3) the power of a spouse to freely contract with others regarding marital property endures until lawfully moderated or terminated.

We would remind appellant that, in the case at bar, the District Court did moderate that above-mentioned spousal power, on September 26, 1978, the day the petition for dissolution was filed, by enjoining the husband from "transferring, encumbering, concealing or otherwise disposing of any property, except in the usual course of business or in the necessities of life." The obvious purpose of the order was to prevent the husband, who controlled the reins and records of the family business, from dissipating or secreting marital assets in what promised to be a prolonged and bitter dispute over distribution of those assets. Therefore, in this case, as distinguished from Lippert, the husband's right to dispose of jointly owned property had been sharply circumscribed. We would also point out to appellant that nowhere in Lippert did this Court declare that the time of determining marital estate must be the date of dissolution. In fact, we stated that no single event in the dissolution process necessarily establishes the time for proper valuation, whether it be the date of filing, the date of trial or the date of the dissolution itself. In re Marriage of Lippert, ____ Mont. at ____, 627 P.2d at 1208, 38 St.Rep. at 628. Clearly, although the date of filing is not determinative of the time of valuation, neither is it automatically beyond consideration as too remote. We have stated many times that, in considering appeals arising from disposition of marital property upon dissolution, we will consider each case in light of the

facts unique to it.  In re Marriage of Aanenson (1979), _____

Mont. ____, 598 P.2d 1120, 36 St.Rep. 1525.  Here, before

the transfer of $51,000 in and out of the husband's account,

the District Court, in its September 26, 1978, injunction

served the husband with fair warning that he must be responsible

for the disputed property in his control.  No such warning

was given in Lippert; indeed, in that case, all transfers to

the husband's accounts from shared property were completed

before the petition for dissolution was filed.  In Lippert,

this Court found there was no evidence that the funds had

disappeared in any way but through bad investments, and

there was substantial evidence that they were thus dissipated.

Here, the wife submitted abundant evidence in the form of

bank statements showing the deposit and withdrawal of substantial

sums of money, although the husband admittedly was doing no

work other than collecting rent and swapping real estate

during the period in question.  That real estate, according

to the husband's own testimony, was in the name of both

parties.  The evidence indicates that he would obtain his

wife's signature, sell the property, and bank the money in

his personal account, all during the time that the injunction

was in force.  Furthermore, although the husband testified

that the money was spent primarily on business, and living

expenses, he produced no cancelled checks, no receipts, no

evidence whatsoever to support his claim, except a list of

expenses he himself had drawn up.  He admitted to paying his

wife no maintenance, although he did pay some utility bills,

and occasionally signed some small checks over to her during

the separation period prior to the dissolution.  When questioned

by the wife's counsel as to the origin and disposition of

the $51,000, his responses were evasive in the extreme.  An

example follows:

"A. . . . '78 was the last time I was doing any work . . . September of '78. . . I made some work here and there. But it was the last time I did any physical, manual labor. . .

"Q. How much money have you deposited in that account [with the First Metals Bank] since September of 1978, the last time you had any work?

"A. I don't know.

"Q. How about $51,175?

"A. That I deposited in there?

"Q. Yes.

"A. If I deposited in there -- a lot of stuff I would buy for people. Some of it is mine.

"Q. Well, if the bank statements show that, in September of '78 to February of '80, you've run through that account, made deposits in it of $51,175 --

"A. A lot of it I took out of the bank, put in my account to pay bills with.

"Q. Bills to help your wife?

"A. To pay for my property; pay my taxes, things like that.

"Q. Where did you get the $51,000 to deposit in the account if you didn't have a job?

"A. It all shows in there. I had different things.

". . .

"Q. How much money do you have?

"A. You know what, I don't know.

"Q. You've got a lot of money, don't you?

"A. No. Just what is there, what is in the escrow. Everything is in mine and Margaret's name.

"Q. Mr. Hunter, this account that I've referred to is an account in your own name?

"A. Call the bank and Margaret Hunter can sign checks on it.

"Q. Did you ever tell your wife to write checks on this account?

-7-

"A.   No.   I had a checking account for her at the Security so we didn't get it mixed up.

".   .   .

"Q.   Have you made any money on investments where it didn't require you to work?

"THE COURT:   During what period of time?

"Q.   From September of '78 until now.

"A.   No.   I lost money, I had money come to me before that I made.   I drew it out of the bank. I paid bills with it."

The District Court's finding of fact No. IV states:

"The Court finds that during the pendency of the above-entitled action, Leonard Hunter deposited in accounts at the First Metals Bank & Trust Company approximately fifty-one thousand ($51,000), which was received from various sales of property and from other unidentified sources.   Respondent's Exhibit 'F' shows that many of the items of money received and spent were from the sale of properties owned by the parties and not accounted for to Margaret Hunter."

On the basis of that finding, the trial court found the $51,000 to be a marital asset and awarded the asset to the husband.   The husband now contends that such an award is reversible error.

We disagree.   The purpose of the District Court in issuing its injunction dated September 26, 1978, was obviously to protect the marital estate.   Its conclusion that the husband deposited in a personal account a large sum of money obtained by his making incursions into that estate is supported by substantial evidence, much of it supplied by the husband's testimony and in his Exhibit "F."   The husband was given every opportunity to present evidence in support of his bald statements that the money was spent on business or in maintaining himself and his wife.   No such evidence was presented.   Clearly, the District Court was unpersuaded by the husband's claim that his personal accumulation and

disposition of $51,000 was a blameless series of business transactions. That court's skepticism appears well-founded in light of the husband's own testimony that before the distribution he sold $1,000 worth of Pabst stock in defiance of the court's injunction, and proof that subsequent to the distribution he appropriated the $5,000 real estate contract with the Dennises, which had been awarded to his wife. We affirm our statement in Lippert, that findings and conclusions may not rely solely on a perceived lack of credibility, but must be supported by evidence. Here, we find ample evidence to support the trial court.

The standard of review of property distribution on dissolution is well settled in Montana:

> "A district court has far-reaching discretion in resolving property divisions and its judgment will not be altered unless a clear abuse of that discretion is shown. The criteria for reviewing the District Court's discretion is: Did the court in the exercise of its discretion act arbitrarily without employment of conscientious judgment, or exceed the bounds of reason in view of all the circumstances." Stratford v. Stratford (1981), ____ Mont. ____, 631 P.2d 296, 298, 38 St.Rep. 1093, 1095; In re Marriage of Aanenson (1979), ____ Mont. ____, 598 P.2d 1120, 36 St.Rep. 1525; In re Marriage of Kramer (1978), 177 Mont. 61, 580 P.2d 439; Zell v. Zell (1977), 174 Mont. 216, 570 P.2d 33.

A review of the record indicates that, far from acting arbitrarily or unreasonably, the District Court acted carefully and conscientiously to protect the marital estate initially, and to equitably apportion it subsequent to dissolution. That the court considered the value of the marital estate prior to dissolution is not error in light of the circumstances of this case. We find no abuse of discretion in the District Court's inclusion of the $51,000 in the marital estate; nor do we find an abuse of discretion in the court's award of that sum to the husband.

II.

The husband argues that the District Court's failure to determine the net worth of the estate constitutes reversible error, requiring remand for retrial. He bases his argument upon the District Court's failure to make an explicit finding totalling all of the marital assets and expressly allocating the liabilities.

The well-settled principle is set forth clearly in Schultz v. Schultz (1980), _____ Mont. _____, 613 P.2d 1022, 1024, 37 St.Rep. 1297, 1299:

> "This Court has, since 1975 when the Marriage and Divorce Act was passed, considered many cases with regard to proper property division in dissolution of marriage cases. We have adopted certain guidelines for the equitable distribution as mandated under section 40-4-202, MCA.
>
> "Several criteria stand out as mandates, first of which is that the District Court make findings of fact from which there can be established a net worth of the parties. (Citations omitted).
>
> "The above cases generally hold that there must be complete findings as to the assets and liabilities of the parties and their values for establishment of a net worth. This Court has allowed a failure to find a net worth to stand only where there has been a 50/50 split of the property. (Citations omitted)."

In the case at bar, the District Court's failure to state the dollar value of the total estate is purely a technical omission. Exhibits "A" and "B" are incorporated into finding of fact number I, which states:

> "The Court finds that all of the property described in Exhibits 'A' and 'B' attached hereto and by reference made a part hereof, were acquired by the parties during their marriage and are part and parcel of the marital assets of the parties."

Those exhibits constitute a painstakingly complete and careful list of the marital assets, a determination of their value, and a total of the amount awarded to each of the

-10-

parties. It is evident that the purpose of the court was to divide the assets as equally as possible. The values assigned the various items of real estate and personal property are supported by evaluations of their worth offered by qualified appraisers or by the parties themselves. The transcript reveals that, contrary to the husband's claim, the value of a great many of the items was determined by his own testimony. It is true that the views of husband and wife diverged sharply as to the value of certain real property, largely because one viewed the property as raw land and the other weighed its development potential. Developers and appraisers themselves disagreed in their valuations.

> "The District Court, as the trier of fact, in this trial without a jury, has the discretion to give whatever weight it sees fit to the testimony of land appaiser witnesses. Dickerson v. Dickerson (1980), Mont., 614 P.2d 521, 37 St.Rep. 1286. Unless the valuation is clearly erroneous, it shall not be reversed on appeal. Rule 52(a) M.R.Civ.P." In re Marriage of Jensen (1981), ____ Mont. ____, 631 P.2d 700, 702, 38 St.Rep. 1109, 1111.

Viewing the evidence in the light most favorable to the prevailing party, we find that there was sufficient evidence before the District Court to support the value it found applicable to those disputed lots and acres. Its valuation was not clearly erroneous; it was based upon substantial evidence and will not be overturned. See Cameron v. Cameron (1978), 179 Mont. 219, 227-228, 587 P.2d 939, 945.

Likewise, there is ample evidence that the District Court carefully considered the liabilities of the estate, and, while not giving them an explicit dollar value, equitably determined that they should be borne by the husband. On direct examination, the husband was asked whether the debts listed on his Exhibit "H" were his obligation:

"A. Well, I plan on paying them.

"Q. All right. Are they your responsibility?

"A. Yes."

The District Court subtracted the debts from the property to which they attached, when possible. For example, the 1979 Cadillac valued by the husband at $12,000 (with $6,000 owing) and awarded to him was valued at only $6,000 by the court.

The court clearly intended that the husband pay the debts. His property award was greater than the wife's and the court did not award her maintenance. Furthermore, in its findings and conclusions the decree clearly stated that the property in Exhibit "A" was to go to Margaret Hunter free and clear of all liens and encumbrances. The property in Exhibit "B" was to go to Leonard Hunter; there is no clause indicating that his award is not subject to creditors' claims.

In In re Marriage of Metcalf (1979), ____ Mont. ____, 598 P.2d 1140, 36 St.Rep. 1559, this Court found that the District Court's failure to consider the unsecured debts of the marital estate was an abuse of discretion. In that case, however, there was no evidence that the court considered the debts at all, and if the husband had received the burden of their payment, total liabilities from the estate would have exceeded his share of the assets. Here, there is convincing evidence that the court carefully considered the debts, incorporated them into its valuation of marital property when possible, and decided that their payment should be the husband's responsibility. There is no abuse of discretion by the District Court and no unreasonable burden placed on the husband, whose share of the marital estate amounts to over $200,000.

-12-

This Court has held that the cumulative effect of the findings can be equivalent to a finding of net worth when relevant factors are considered and adequately set forth by the trial court. In re Marriage of Bosacker (1980), ____ Mont. ____, 609 P.2d 253, 256, 37 St.Rep. 469, 471. The record clearly indicates that the trial court assessed the value of the total marital estate, including the debts thereof, and did its best to equitably apportion the assets between the parties. We find no abuse of discretion by the District Court, under the circumstances set forth above, in its failure to state net worth and debts at exact dollar value.

III.

We turn now to the several other allegations of error raised by the husband on appeal.

The husband claims that the District Court unfairly awarded the wife both the family residence and "the Duffy place" where he had stayed since the separation. We point out that in its amended decree dated October 6, 1980, the District Court awarded "the Duffy place" residence to the husband.

The husband also claims that the District Court relied upon the proposed findings submitted by the wife and cites Tomaskie v. Tomaskie (1981), ____ Mont. ____, 625 P.2d 536, 539, 38 St.Rep. 416, 419, as declaring categorically, "That is wrong!" What is wrong, and it is considered an ethical more than a legal breach in Tomaskie, is not for a trial judge to rely upon proposed findings, but for him to rely too heavily on them, to the exclusion of a consideration of the facts and the exercise of his own judgment. There is no merit in the husband's allegation. In Tomaskie, the reversal

-13-

turned upon the grossly inadequate findings of the trial court. Here, the findings are extensive, detailed and comprehensive. Many of them reflect the husband's testimony as to the value of specific property and facts surrounding the marriage and the dissolution. Every page of the findings reflects consideration of the facts presented and the areas of dispute. There is no abuse of discretion here.

The husband argues that the District Court erred in finding that the wife was not qualified for employment because she was working as late as 1978, and presented no medical evidence of incapacity. We point out that the wife testified that she suffered from high blood pressure and a bad back and leg, and felt that her health prevented her from returning to work. It was well within the discretion of the District Court to find the wife's testimony had sufficient weight to support its finding that she was not qualified to work.

The husband did not argue on appeal, as he did subsequent to the decree, that the attachment of a mortgage to all of his property, for the purpose of securing his $9,000 obligation to his wife, was inequitable. He did, however, remark that the husband should leave the marriage "with a fair degree of dignity." As a court of equity, we must consider the effect upon the husband of mortgaging assets worth many times the amount of his obligation. The husband is in the business of trading real estate. To freeze his assets for ten years would deprive him of his occupation and his income. That is unreasonable and inequitable. It would be far more reasonable to mortgage only one or two items of property having sufficient value to secure the obligation; for example No. 7 of Exhibit "B" of the amended decree, half-interest in

-14-

a duplex, valued at $22,500.00, could be mortgaged.

The judgment of the District Court is affirmed in all respects except that last mentioned. We remand this case to the District Court with orders to amend the decree so as to retain a mortgage on only so much of the husband's property as is necessary to secure the payment of $9,000 to the wife.

_____
Justice

We Concur:

_____

_____

_____

_____
Justices